**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | * | |
| | * | **Case Nos. 24-12500; 24-12504;** |
| | | **24-12506; 24-12508; 24-24511** |
| **WARFIELD HISTORIC PROPERTIES,** | * | **(Chapter 11)** |
| **LLC,** *et al.*, | | |
| | * | **Jointly Administered Under** |
| Debtor. | | **Case No. 24-12500-LSS** |
| | * | **(Chapter 11)** |

*    *    *    *    *    *    *    *    *    *    *    *    *    *

**OBJECTION OF THE TOWN OF SYKESVILLE TO**
**DEBTORS' MOTION FOR AN ORDER APPROVING AND**
**AUTHORIZING REJECTION OF REVERSION AGREEMENT**

The Town of Sykesville (the "Town"), by its undersigned counsel, hereby objects to the

Debtors' Motion for an Order Approving and Authorizing Rejection of Reversion Agreement (the

"Motion") filed by debtors Warfield Historic Properties, LLC ("WHP") and Warfield Historic

Quad, LLC ("Quad" and, collectively with WHP, the "Debtors"), and states:[1]

**Introduction**

1.      In their Motion, the Debtors seek authority to reject a certain Reversion Agreement

dated June 26, 2018, by and between the Town and the Debtors.  As more fully explained below,

the Reversion Agreement, including the incorporated Preservation Agreement, which by law, must

be read together, is not an executory contract within the meaning of 11 U.S.C. § 365(a) because

"material" obligations did not remain unperformed by both sides as of the date the Debtors filed

---

[1]As a preliminary matter, under Local Bankruptcy Rule 6006-1, Debtors "must give notice" of their motion to reject to the non-debtor party to the contract at issue, among other interested parties named therein. *See* Local Bankruptcy Rule 6006-1(a).  Moreover, "[T]he notice must state that the Court may rule upon the motion without a hearing if there is no timely written request for a hearing or opposition to the relief requested."  *Id.*  Debtors failed to provide notice of their motion as required under Local Bankruptcy Rule 6006-1(a).

their bankruptcy petition.[2]  Further, the Reversion Agreement is not an executory contract because it and the incorporated Preservation Agreement created covenants that ran with the land. Consequently, the Reversion Agreement is not an executory contract, and it is not capable of assumption or rejection under § 365.  The Debtors' Motion should be denied.

### Background

2.      On April 17, 2014, the Town and the Warfield Development Corporation, as sellers, and the Warfield Collaborative, L.L.C. (the "Collaborative"), as Purchaser, entered into a Purchase and Sale Agreement (the "Sale Agreement"), pursuant to which the Collaborative agreed to acquire a tract of land containing various parcels, including a parcel, designated as Parcel D, upon which there were and remain 14 historic structures.  *See* Reversion Agreement, attached to Debtors' Motion as Exhibit A, p. 1.  The Debtors are successors-in-interest to the Collaborative.

3.      As contemplated by the Sale Agreement, because of the presence of the historic properties, Parcel D was subject to a Parcel D Preservation Agreement (the "Preservation Agreement"), an Escrow Agreement, and the Reversion Agreement.  *See* Second Amended Complaint (together with exhibits) ("Second Am. Compl.") filed in the case styled *Town of Sykesville v. Warfield Historic Properties, LLC, et al.*, Circuit Court for Carroll County, Case No. C-06-CV-23-000249 (the "Lawsuit), a true and correct copy of which is attached as Exhibit 1, ¶ 7 (citing Sale Agreement, ¶ 7(H)(i)).

4.      As further contemplated under the Sale Agreement, Parcel D was subjected to a land condominium regime with each historic building located on a parcel individually designated as a condominium unit.  *See id.,* ¶ 8 (citing Sale Agreement, ¶ 5B(iv)).

---

[2]The Preservation Agreement is the subject of a separate Debtors' Motion for an Order Approving and Authorizing Rejection of Parcel D Preservation Agreement.  (*See* ECF No. 42).  Because the Reversion Agreement and Preservation Agreement are tied together as a matter of fact and law, the Town is concurrently filing an opposition to the Debtors' motion to reject as to the Preservation Agreement that adopts and incorporates this opposition.

5.      The Sale Agreement further specified that Purchaser had a Preliminary Concept Plan for the property, which included "mixed use development, consistent with modern planning and development practices, providing for an employment center (including office, light industrial, research and development and business incubation space), with a complementary blend of retail space and multi-family and townhome residential units, with the further goal of preservation and adaptive re-use of existing historic buildings and enhancement of the Town's employment base." *See id.,* ¶ 11 (*citing* Sale Agreement, p. 1 & Ex. B to Agreement of Sale.)

6.      The Sale Agreement provided the Debtors an inspection period, which was extended multiple times, it included a Fiscal Impact Study commissioned by the Debtors, and it gave the Debtors the "sole and absolute judgment and discretion" to terminate the Agreement of Sale if WDC determined "the Property is not suitable to Purchaser for Purchaser's purposes for any reason whatsoever…."  *See id.* (*citing* Sale Agreement, ¶ 3A.)

7.      The Sale Agreement also provided several conditions to be met by the Town <u>prior</u> to closing in favor of the Debtors including, but not limited to:

      a.  the Town was required to adopt and enact all necessary amendments to the Master Plan and Zoning Ordinance as set forth in the preliminary concept plan attached to the Sale Agreement including all Seller-approved revisions through the date of closing.  *See id.* ¶ (*citing* Sale Agreement, ¶¶ 5A(ii) & 5B(ii));

      b.  the Town had to approve [the Debtors] Final Development Plan.  (*citing* Sale Agreement, ¶¶ 5A(iiii) & 5B(iii)); and

      c.  No governmental body with authority over the "Property" shall have imposed any "moratorium or similar restriction, anticipated moratorium, or prohibition, remaining in effect on the Closing Date, the probable effect of which is to prevent, delay or restrict any approvals or permits which Purchaser needs to be entitled to use the Property as contemplated herein." *See id.* ¶ 18, (*citing* Sale Agreement, ¶ 5(viii)).

8.      If any of the Purchaser's closing conditions were not satisfied, then [the Debtors] had the "sole discretion…to terminate this Agreement by written notice to Seller, whereupon the

3

Deposit shall be immediately returned to Purchaser…" *See id.*, ¶ 21 (*citing* Sale Agreement, ¶ 5, p. 9.).

9.      Also, per the Sale Agreement, the Town and Carroll County agreed to a tax abatement on the subject property. *See id..*, ¶ 33 (*citing* Sale Agreement, ¶ 5(xiii)).

10.     The sale closed on or about June 26, 2018, and the Debtors, together with Warfield Center, LLC, Warfield Properties, LLC and Warfield Restorations, LLC, as successors-in-interest to the Collaborative, acquired title to the properties sold pursuant to the Sale Agreement. *See* Reversion Agreement, p. 1.

11.     As a result of the sale, the Debtors each took title to certain of the Parcel D condominium units.  Quad received a deed for four of the Parcel D units, numbered l through 4 and generally known as "the Quad," and WHP received a deed for condominium units 5 through 8, 12, 13 and 14 (Units 1 through 4, 5 through 8, 12, 13, and 14 collectively hereinafter, the "Historic Structures").

12.     The Sale Agreement contemplated that the [Debtors] would be obligated <u>after</u> closing, *inter alia*, to preserve and rehabilitate the Historic Structures on Parcel D.  To that end, the Debtors each executed the Reversion Agreement, as well as the Preservation  Agreement, and a Parcel D Escrow Agreement, each dated June 26, 2018.  Collectively, these documents provided, among other things, that a certain portion of the proceeds from the sale would be deposited into three escrow accounts and used thereafter  by the Debtors to preserve and rehabilitate the Historic Structures; that certain portions of the escrow funds would  be spent for qualifying activities related to the preservation and rehabilitation of the Historic Structures by the third, seventh and twelfth anniversaries of the signing of the three agreements, and that, if the

Debtors failed to expend the funds by the specified deadlines, the Town could exercise its rights to have any or all of the condominium units revert to it.

### The Reversion Agreement and the Preservation Agreement

13.    Specifically, in the Reversion Agreement, the Debtors acknowledged that, under section 7.H of the Sale Agreement, the Town and the Debtors entered into the Reversion Agreement "to memorialize [the Debtors'] agreement to undertake and complete Eligible Work on Parcel D and that in the event that [the Debtors] failed to complete same in accordance with the milestone timeline set forth in the Preservation Agreement, all remaining funds in escrow pursuant to the Parcel D Escrow Agreement would be released to Seller." Reversion Agreement, p. 1.

14.    The Reversion Agreement provides that the Debtors shall complete certain Eligible Work in accordance with the completion schedule set forth in section 7(a) of the Preservation Agreement, which was incorporated by reference into the Reversion Agreement. *See id.*, ¶ 3(a).

15.    Further, the Reversion Agreement provides that, if the Debtors fail to complete "Eligible Work" within the "completion schedule" contained in the Preservation Agreement, then, within 10 days of their receipt of the Town's written notice of such failure, the Debtors must convey the Parcel D units back to the Town. *See id,* ¶ 4(a). Upon such a reversion, the Reversion Agreement also contains a mechanism for determining the amount (if any) of compensation to be paid to the Debtors from the escrowed development funds for pre-reversion improvements made to the Parcel D properties. *Id*. ¶ 4(c).

16.    Pursuant to the Reversion Agreement, the Debtors' failure to convey title to the Parcel D properties, by execution and delivery of a special warranty deed as provided in ¶ 4(a), constitutes an Event of Default, giving rise to the Town's right to enforce the Reversion Agreement by action for specific performance. *See id*. ¶ 8.

17.     In a hypothetical world in which no Event of Default occurred and the Debtors completed their performance obligation to preserve and rehabilitate a building on a Parcel D unit, the Reversion Agreement would have required the Town simply to release such unit from the operation of the Reversion Agreement.  *Id*. ¶ 9.

18.     In short, the Reversion Agreement obligated the Debtors either to perform their duties under the Preservation Agreement or to convey the Parcel D units back to the Town.  In contrast, with the exception of the Town's essentially ministerial obligation to release units from the operation of the Reversion Agreement upon the Debtor's completion of their performance conditions, the Reversion Agreement imposed no performance obligations on the Town.

19.     The Reversion Agreement also provides that "in the event the Purchaser fails to complete the Eligible Work in accordance with the milestone timeline set forth in the Preservation Agreement all remaining funds held in escrow pursuant to the Parcel D Escrow Agreement…shall be released and disbursed to" the Town.  *See* Second Am. Compl. in Lawsuit, ¶46 (*citing* Reversion Agreement pp. 1-2 & ¶ 1; as well as the escrow agreement ¶ 7(f)).

20.     Further, as can be seen from the instruments themselves and their accompanying intake sheets, both the Reversion Agreement and the incorporated Preservation Agreement were recorded in the land records for the State of Maryland, Carroll County.  *See* Reversion Agreement and intake sheet attached to Debtors' Motion and Preservation Agreement and intake sheet attached to Debtors' motion to reject that agreement (ECF No. 42-1).

21.     The Reversion Agreement has a subordination provision that provides, in part, that the Reversion Agreement "shall not be subordinate to any lien or security interest granted by the [Debtors] in connection with a loan, except as otherwise agreed to by the Town."  Reversion Agreement, ¶ 12.

22.     Still further, the incorporated Preservation Agreement has an assignment provision making any sale of Parcel D, or any unit thereof, to a bona fide third-party purchaser, subject to its terms.  The Preservation Agreement provides:

> In the event the Preservation Agreement has not been terminated and the Town's right of reverter under the Reversion Agreement has not been exercised, if Purchaser desires to sell Parcel D in its entirety to a bona fide third-party purchaser (the **"Parcel D Sale"),** the Parcel D Sale shall be subject to this Agreement, the Parcel D Escrow Agreement and the Reversion Agreement, and Purchaser shall execute such assignments, amendments, and/or other agreements reasonably necessary to assign such rights and obligations to such bona third-party purchaser.  As a condition of the Parcel D Sale, the Purchaser shall payoff all sums due and owing under the Note, and all proceeds from the payoff of the Note shall be added to the balance of the Parcel D Escrow Fund I.
>
> ***
>
> If one or more Units being sold in the Partial Parcel D Sale have not been released from the lien of the Deed of Trust, then Purchaser shall have the right to sell such Unit(s) subject to the partial assignment of all of Purchaser's rights and obligations under the Preservation Agreement, the Parcel D Escrow Agreement and the Reversion Agreement, and provided that upon the closing of such Partial Parcel D Sale, Purchaser deposits with the Escrow Agent a Note Payment in an amount equal to the total release payment for such Units that have not been released from the Deed of Trust, as provided in the Release Exhibit in the Deed of Trust, which shall then release those Units from the lien of the Deed of Trust.  The parties shall cooperate to execute and deliver such partial assignments, amendments, joinders and/or other agreements reasonably necessary to partially assign such rights and obligations to such bona third-party purchaser as to the applicable Unit(s).  Furthermore, the bona fide third-party purchaser shall execute a new Parcel D Escrow Agreement and Reversion Agreement as to those Units being sold in the Partial Parcel D Sale which have not previously been released from the Reversion Agreement, substantially in the form of the Parcel D Escrow Agreement and Reversion Agreement, respectively, executed by Purchaser.

(ECF 42-2, 2, ¶ 9(a)(i), (b)(i)).

23.     At Closing, the Town placed $1,100,000 into the Parcel D Distribution Fund.  At Closing, the Purchaser placed $400,000 in the Parcel D Escrow Fund II.  *See* Second Am. Compl. in Lawsuit, ¶ 39.

24.     The Reversion Agreement and the Preservation Agreement required the Debtors to submit one (1) or more Certificate(s) of Completion with a "minimum aggregate distribution from the Parcel D Distribution Fund and Parcel D Escrow Fund II of Five Hundred Twenty-Five Thousand and No/100 Dollars ($525,000.00)" by June 26, 2021, but they failed to do so as required. *See id.* ¶¶40-41 (*citing* Reversion Agreement ¶ 3(a); Preservation Agreement ¶ 7(a)(i)).

25.     Further, under the terms of the Preservation Agreement, Debtors had ninety (90) days beyond June 26, 2021, to take corrective action and cure the deficiency, which they failed to do. *See id.* ¶ 42.

26.     As of the Petition Date, so few Certificates of Completion had been submitted by the Debtors that no portion of the escrowed Parcel D Distribution Fund had been distributed and only $144,454.00 of Parcel D Escrow Funds II had been distributed. *See id.* ¶ 44.

27.     As a result, well prior to the Petition Date, following the Debtors' failure of performance within the deadlines imposed by the completion schedule set forth in the Preservation Agreement, the Town gave the Debtors written notice on or about May 10, 2023, and amended notice on November 30, 2023, that the Town had elected to have Condominium Units 1 through 4, 5 through 8, and 12, 13, and 14 revert to the Town and requested the special warranty deeds called for in the Reversion Agreement. *See id.* ¶¶ 49, 51. The Debtors failed and refused to do so. *See id.* ¶ 50, 52.

28.     On May 25, 2023, the Town filed the Lawsuit against the Debtors. The Second Amended Complaint filed in the Lawsuit contains one count seeking specific performance as expressly provided for under ¶ 8 of the Reversion Agreement. *See* Second Am. Compl. in the Lawsuit. The foundational premise of the Lawsuit is that as a result of the Debtors' Event of Default, namely, their failure to execute and deliver special warranty deeds conveying the units at

issue back to the Town, specific performance should be granted.  Further, the Town expressly alleged that it "has performed all applicable conditions precedent necessary for an award of specific performance in accordance with the respective contracts," i.e. that there remain no executory obligations of the Town, for the right of reverter had vested and there remained no material obligation for the Town to perform.  *See* Second Am. Compl. ¶ 64.

<u>**Argument**</u>

29.    The burden of persuasion on a motion to reject under § 365 falls upon the Debtors as movant.  *See In re Daufuskie Island Properties, LLC*, No. 09-00389-JW, 2011 WL 6936534, at *5 (Bankr. D.S.C. June 23, 2011).

30.    The Debtors have not met their burden and their Motion should be denied because the Reversion Agreement, together with the incorporated Preservation Agreement, is not an executory contract that the Debtors are entitled to assume or reject.

31.    "[B]y its terms, § 365 applies only to executory contracts and unexpired leases." *Chesapeake Fiber Packaging Corp. v. Sebro Packaging Corp.*, 143 B.R. 360, 374 (Bankr. D. Md. 1992).  The term "executory contract" is not defined in the Bankruptcy Code.  However, the Fourth Circuit has adopted the Countryman test to evaluate whether a contract is executory for purposes of § 365.  By that test, a contract is executory if the "obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing performance of the other."  *Gloria Mfg. Corp. v. International Ladies' Garment Workers' Union*, 734 F.2d 1020, 1021-22 (4th Cir. 1984) (citation omitted).  Courts must look to state law to determine whether each party to the contract has material, remaining unperformed obligations.  *See In re Cho*, 581 B.R. 452, 461 (Bankr. D. Md. 2018) (under Countryman test, an obligation is "material" if its breach "would allow the non-

breaching party to rescind, or cease performing under, the contract under applicable non-bankruptcy law"). *See also In re Svenhard's Swedish Bakery*, 653 B.R. 471, 477 (B.A.P. 9th Cir. 2023) (contract was not executory under Maryland law).

32.    Further, courts applying the Countryman test have emphasized the requirement of materiality of the mutual obligations left to be performed for a contract to qualify as executory. As the Seventh Circuit noted, "it is the rare agreement that does not involve unperformed obligations on either side," and "Congress intended § 365 to apply to contracts where significant unperformed obligations remain on both sides." *In re Streets & Beard Farm P'ship*, 882 F.2d 233, 235 (7th Cir. 1989). More recently, the Tenth Circuit made similar observations while noting that the Countryman test counted only the remaining or future "material" obligations of both parties in determining whether a contract is executory. *In re Baird*, 567 F.3d 1207, 1211 (10th Cir. 2009).

33.    The Bankruptcy Appellate Panel of the Ninth Circuit's recent decision in *In re Svenhard's Swedish Bakery*, 653 B.R. at 476-479, applying the Countryman test and Maryland state law on "materiality," is instructive. There, a debtor appealed a bankruptcy court's order denying its motion to assume and assign under §365, a purported executory contract. The contract at issue was a settlement agreement between the Debtor, Swedish Bakery, and a pension fund, which provided for the release of millions of dollars of Debtor's liability after payment of reduced amounts on terms specified in the agreement. The bankruptcy court held that the settlement agreement was not an executory contract because the non-bankrupt pension fund's only contractual obligation, to release its claim upon full payment under the agreement, was not due until after the debtor fully performed. Thus, there were not material obligations remaining on both sides. The appellate panel affirmed

34.    In explaining its decision, the *Swedish Bakery* Court observed that the Countryman test requires the Court first to determine whether both parties have remaining material obligations. *See id.* If either party has "substantially performed," then the contract is not executory. *See id.* (citation omitted). The Court then determines, as of the petition date, whether failure to perform would give rise to a material breach and excuse performance by the other party. *See id.* (citation omitted). "The materiality of a remaining obligation and whether the failure to perform a remaining obligation is a material breach of the contract is an issue of state law." *Id.* (citation omitted).

35.    The Court stated that under Maryland law, which governed the contract at issue and thus its analysis, "any breach of contract may give rise to a cause of action for damages, [but] only a material breach discharges the non-breaching party of its duty to perform." *Id.* (*citing Jay Dee/Mole Joint Venture v. Mayor and City Council of Baltimore*, 725 F.Supp.2d 513, 526 (D. Md. 2010)). A breach is material under Maryland law, it said, if it "affects the purpose of the contract in an important or vital way." *Id.* (*citing In re Cho,* 581 B.R. 452, 462 (Bankr. D. Md. 2018) (cleaned up)).

36.    Applying these principles, the Court held that the debtor had failed to demonstrate, and it did not find, any error in the bankruptcy court's ruling that the settlement agreement was not an executory contract. It reasoned that, "The Settlement plainly provides for the Pension Fund to release claims upon full payment by Debtor. Thus, the failure of the Pension Fund to execute the releases would not constitute a material breach sufficient to excuse Debtor's performance." *Id.* Further, it explained the relevant Maryland law:

> The express requirement for the Pension Fund to execute releases "[u]pon full payment" creates a performance condition under Maryland law. *See Chirichella v. Erwin*, 270 Md. 178, 310 A.2d 555, 557 (1973) (stating that phrases such as "if," "provided that," "when," "after," "as soon as," or "subject to" are sufficient to

create express conditions). "Generally, when a condition precedent is unsatisfied, the corresponding contractual duty of the party whose performance was conditioned on it does not arise." *B & P Enters. v. Overland Equip. Co.*, 133 Md.App. 583, 758 A.2d 1026, 1038 (Md. Ct. Spec. App. 2000).

Thus, the Pension Fund could not breach the Settlement by refusing to execute the releases unless Debtor had fully performed by making all payments. *See NSC Contractors, Inc. v. Borders*, 317 Md. 394, 564 A.2d 408, 413 (1989) ("It is fundamental that where a contractual duty is subject to a condition precedent ... there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused.") (quoting *Laurel Race Course v. Regal Constr. Co.*, 274 Md. 142, 333 A.2d 319, 327 (1975)); Restatement (Second) of Contracts § 235, *cmt. b* ("Non-performance is not a breach unless performance is due. Performance may not be due because ... a condition has not occurred.").

*Id.* at 477-78.  Thus, the Court held that, "Because the Pension Fund's contractual obligations are due only after Debtor fully performs by making all required payments, a breach by the Pension Fund could not logically excuse Debtor's performance of its duty to make payments."  The agreement, therefore, was not executory.  *See id.*

37.    As an additional reason, the Court questioned whether the pension fund's obligation to execute releases was material because the settlement agreement and proof of payment would operate as a defense to any collection action, and the releases themselves were "likely ministerial and not sufficient to render the Settlement executory."  *Id.* at 478 (citation omitted).

38.    Like *Swedish Bakery*, the Debtors here have failed to identify in their Motion material unfulfilled obligations of each side, and they cannot meet their burden to do so.  Rather, applying the above principles, the Reversion Agreement, with the incorporated Preservation Agreement, is not an executory contract.

39.    The Reversion Agreement, the Preservation Agreement and the Escrow Agreement each were executed as a condition of, and at, closing.  These documents are to be read together as a matter of both bankruptcy and Maryland law because an executory contract must be assumed or

rejected in its entirety. *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 41 (3d Cir. 1989). Further, separately executed documents must be assumed or rejected together if the parties intended them to constitute one agreement. *See Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.), Inc.)*, 303 B.R. 574, 576-577 (D. Del. 2003). Under Maryland's ordinary contract principles, where multiple documents are part of a single transaction, they will be read together. *See Ford v. Antwerpen Motorcars Ltd.*, 443 Md. 470, 479 (2015). The Debtors have not proposed to reject the Escrow Agreement.

40. The purpose of the Reversion Agreement was to require the Debtors to preserve and rehabilitate the Historic Structures on the Parcel D units, using funds escrowed for that purpose, pursuant to the completion schedule set forth in the incorporated Preservation Agreement. The Escrow Agreement is inextricably intertwined with the Reversion Agreement and Preservation Agreement because it implemented the mechanism for funding the Debtors' preservation and rehabilitation of the Parcel D units. Further, as noted above, the Escrow Agreement provides what is supposed to happen with the escrowed funds when the Debtors fail to complete the Eligible Work in accordance with the milestones in the Preservation Agreement. *See supra.*

41. Thus, as can be seen on their face, even at the outset, the Reversion Agreement, Preservation Agreement, and Escrow Agreement assigned material performance obligations only to the Debtors, the failure of which obligated the Debtors to convey the listed Parcel D properties back to the Town. In contrast, the Town's obligations—to approve zoning consistent with the Debtors' final development plan for a mixed use Planned Employment Center, tax abatement in favor of the Debtors, etc.—were conditions of closing on the Sale Agreement, and/or its duties were satisfied at closing, such as conveying title. For this reason alone, therefore, the Reversion

Agreement and Preservation Agreement are not executory and the Debtors' motion(s) to reject should be denied.

42.     Further, while the Reversion Agreement provided the Town with rights and remedies to monitor the Debtors' performance under its terms and to enforce rights upon the Debtors' failure to perform, it did not obligate the Town to undertake any action or perform any condition to be entitled to the Debtors' performance.

43.     Rather, whether a contract is executory is generally determined at the petition date. *In re Hawker Beechcraft, Inc.*, 486 B.R. 264 (Bankr. S.D.N.Y. 2013).  In this case, the Debtors were in default of the Reversion Agreement before bankruptcy, with cure periods having expired, based on notices by Town that pre-date the bankruptcy filing, so there remained nothing left for Debtors to do.  This is confirmed by Maryland law providing that the remedy of specific performance is only available where, among other things, the requesting party has "fully, not partially, performed everything required to be done on his part" under the agreement.  *Cattail Assoc., Inc. v. Sass*, 170 Md. App. 474, 499 (2006) (citations omitted); *Geoghegan v. Grant*, 2011 WL 673779, at *9 (D. Md. Feb. 17, 2011).

44.     Accordingly, for this additional reason, the Reversion Agreement and Preservation Agreement were not executory.  *See also Kucin v. Devan*, 251 B.R. 269, 271–72 (D. Md. 2000) (holding that executive compensation agreements were not executory where rights had "vested" prior to petition date).

45.     Indeed, it was only if the Debtors completed their obligations under the Reversion Agreement with respect to a particular building on a covered Partial D unit would the Town have had an obligation to release a unit from the coverage of the Reversion Agreement.  Under Maryland law, any obligation of the Town to release units from the coverage of the Reversion Agreement

was subject to a "performance condition." Like *Swedish Bakery*, because the Debtors never satisfied the conditions precedent to the Town's duty to release the units at issue, the Town never had such a duty and could not have materially breached the Reversion Agreement through nonperformance. *See Swedish Bakery*, *supra; see also NSC Contractors, Inc. v. Borders*, 317 Md. 394, 564 A.2d 408, 413 (1989 ("It is fundamental that where a contractual duty is subject to a condition precedent . . . there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused.") (quoting *Laurel Race Course v. Regal Constr. Co.*, 274 Md. 142, 333 A.2d 319, 327 (1975)) (*cited* in *Svenhard's Swedish Bakery*, 653 B.R. at 478)).

46.    Rather, as stated above, the Town commenced the Lawsuit prepetition to address the Debtors' failure of performance under the Reversion Agreement and related Preservation Agreement and Escrow Agreement pertaining to the listed Parcel D units at issue. The Debtors' Motion makes no reference to the Lawsuit. Perhaps in an effort to obfuscate their history of nonperformance of their obligations with respect to the Parcel D units at issue, the Debtors limited their discussion of the Reversion Agreement to one conclusory sentence in which they contend that both the Debtors and the Town have material continuing obligations under it. *See* Motion, ¶ 6. That self-serving characterization ignores the nature and purpose of the Reversion Agreement, the Preservation Agreement, the Debtors' prepetition failure to perform under these agreements, and the Town's ongoing effort to regain title to the certain Parcel D units at issue by specific performance as a result of the Debtors' failure of performance. Regardless of that history, the Reversion Agreement and the Preservation Agreement were not executory contracts when the Debtors commenced their chapter 11 cases, and it is not subject to rejection under § 365. The Debtors' motion(s) should be denied.

47.     Finally, the Debtors' Motion(s) should be denied for the additional reason that the obligations under the Reversion Agreement and the Preservation Agreement are covenants that run with the land and are not subject to rejection under § 365.  This is illustrated by the recent case of *In re Wildwood Villages, LLC*, No. 3:20-BK-02569-RCT, 2022 WL 1599967, at *4 (Bankr. M.D. Fla. Jan. 21, 2022).  There, the Court held that recreational facilities required to be built for a mobile home subdivision under recorded deed restrictions "went to the heart of the development and touched every lot."  The Court thus concluded that the debtor's obligation was a covenant running with the land under state law and, "As such, the obligation is not part of an executory contract that can be assumed or rejected under § 365 of the Bankruptcy Code."  *Id.* at *4, n.9 (collecting cases).  The Court added that, "'As explained by the court in the case of *In re Rivera*, "because a covenant is a property interest and not a contract, it is not capable of rejection.'"  *Id.* (citation omitted).

48.     Like *Wildwood Villages*, the obligations under the Reversion Agreement and the Preservation agreement create covenants that run with the land and are thus not capable of being rejected under §365.  Under Maryland law, "Whether a covenant touches and concerns the land may be considered in terms of the burdens or benefits it imposes." *Cnty. Commissioners of Charles Cnty. v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 448, 784 A.2d 545, 558 (2001) (citation omitted).  The benefits and burden tests are stated in the alternative and, if either is met, the covenant may be running with the land.  *See id.*

49.     Further, the Maryland cases give "critical effect" to the presence or absence of language binding successors and assigns; if these words are present, "the covenant is one running with the land or the functional equivalent thereof.  That is, when the performance of the covenant touches and concerns the land within the meaning of the 'benefit or burden' standard, it is deemed

16

one running with the land, even when it deals with something not in *esse*, when the agreement expressly binds successors and assigns." *Id.* (citation omitted). Thus, under Maryland law, "a covenant can run with the land if: '(1) the covenant 'touch[es] and concern[s]' the land; (2) the original covenanting parties intend the covenant to run; and (3) there be some privity of estate and that (4) the covenant be in writing.'" *Id.* at 450 (*citing Mercantile-Safe Deposit and Trust Co.*, 308 Md. 627, 632 (1987).

50.     Here, as noted above, the Reversion Agreement and incorporated Preservation Agreement are recorded in the land records for Carroll County. As in *Wildwood Villages, supra,* the Debtors' obligations in the agreements here to rehabilitate the Historical Structures "went to the heart of the development and touched every lot," so they plainly touched and concerned the land. Further, as noted above, the Preservation Agreement, incorporated into the Reversion Agreement, has an assignment provision that expressly makes any sale of Parcel D, or any unit thereof, to a bona fide third-party purchaser, subject to its terms. This assignment provision is the "critical effect" the Supreme Court of Maryland held renders an instrument a covenant that runs with the land. The Debtors, however, seek to remove the entirety of the burden of these covenants from their real property interests, while at the same time retaining the benefits of the Sale Agreement to title to the property and tax abatement. The Reversion Agreement and Preservation Agreement may not be rejected under § 365 for this additional reason that these agreement contain covenants that run with the land and are thus not subject to assumption or rejection.

**Conclusion**

WHEREFORE, for the foregoing reasons, The Town of Sykesville, respectfully requests that the Court enter an Order denying the Motion and granting The Town of Sykesville such other and further relief as the Court may deem just and appropriate.

Dated: May 1, 2024                                  /s/ Bradley J. Swallow

                                                   Bradley J. Swallow, Bar No. 11250
                                                   Eric S. Schuster, Bar No. 03417
                                                   FUNK & BOLTON, P.A.
                                                   100 Light Street, Suite 1400
                                                   Baltimore, Maryland 21202
                                                   410.659.8320 (telephone)
                                                   410.659.7773 (facsimile)
                                                   bswallow@fblaw.com

                                                   Counsel for The Town of Sykesville

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of May 2024, a copy of the foregoing Objection of the Town of Sykesville to Debtors' Motion for an Order Approving and Authorizing Rejection of Reversion Agreement was served electronically by the Court's CM/ECF system on the following:

Michael J. Lichtenstein, Esquire mjl@shulmanrogers.com
Lynn A. Kohen, Esquire lynn.a.kohen@usdoj.gov
US Trustee – Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV
Robert B. Scarlett, Esquire RScarlett@ScarlettCroll.com,
krynarzewski@scarlettcroll.com, scarlettrr64434@notify.bestcase.com

                                          /s/ Bradley J. Swallow
                                          Bradley J. Swallow

52050.043:235159v.4