**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | | |
|---|---|---|
| **WARFIELD HISTORIC PROPERTIES, LLC** | ) | |
| One Research Court, Suite 450 | ) | **Adversary No. _____** |
| Rockville, Maryland 20850 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **WARFIELD HISTORIC QUAD, LLC** | ) | |
| One Research Court, Suite 450 | ) | |
| Rockville, Maryland 20850 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **WARFIELD RESTORATIONS, LLC** | ) | |
| One Research Court, Suite 450 | ) | |
| Rockville, Maryland 20850 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **WARFIELD CENTER, LLC** | ) | |
| One Research Court, Suite 450 | ) | |
| Rockville, Maryland 20850 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **WARFIELD PROPERTIES, LLC** | ) | |
| One Research Court, Suite 450 | ) | |
| Rockville, Maryland 20850 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| **v.** | ) | |
| | ) | |
| **TOWN OF SYKESVILLE** | ) | |
| 7547 Main Street | ) | |
| Sykesville, Maryland 21784 | ) | |
| | ) | |
| Defendant. | ) | |

---

1

## ADVERSARY PROCEEDING COMPLAINT

Plaintiffs Warfield Historic Properties, LLC, Warfield Historic Quad, LLC, Warfield Restorations, LLC, Warfield Center, LLC, and Warfield Properties, LLC (collectively, the "Plaintiffs"), by and through their undersigned counsel, file this Complaint and allege the following in support of the requested relief:

## JURISDICTION

1.      This is an adversary proceeding in which the Plaintiffs are seeking damages against Defendant Town of Sykesville (the "Town") for the Town's breach of the implied covenant of good faith and fair dealing, tortious interference with prospective advantage, and false light.

2.      On March 26, 2024, Plaintiffs filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3.      Plaintiffs continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a), 1108, and 1184 of the Bankruptcy Code.

4.      The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 157 and 1334.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

6.      Plaintiff Warfield Historic Properties, LLC is a Maryland limited liability company with its principal place of business located at One Research Court, Suite 450, Rockville, Maryland 20850.

7.      Plaintiff Warfield Historic Quad, LLC is a Maryland limited liability company with its principal place of business located at One Research Court, Suite 450, Rockville, Maryland 20850.

2

8.      Plaintiff Warfield Restorations, LLC is a Maryland limited liability company with its principal place of business located at One Research Court, Suite 450, Rockville, Maryland 20850.

9.      Plaintiff Warfield Center, LLC is a Maryland limited liability company with its principal place of business located at One Research Court, Suite 450, Rockville, Maryland 20850.

10.     Warfield Properties, LLC is a Maryland limited liability company with its principal place of business located at One Research Court, Suite 450, Rockville, Maryland 20850.

11.     Defendant Town of Sykesville is a municipal corporation located in Carroll County, Maryland.

## FACTS COMMON TO ALL COUNTS

12.     Springfield Hospital Center ("SHC"), originally set on 1,300 acres, began admitting psychiatric patients in Maryland in July 1896.  By the late 1940s, its patient population exceeded 3,000, and the hospital became one of the subjects of a landmark Baltimore Sun series, "Maryland's Shame," which detailed the horrendous treatment of patients and deplorable conditions in five of Maryland's taxpayer-funded mental institutions. In the 1990s, due to deinstitutionalization and other factors, the State of Maryland (the "State") began to shutter portions of SHC, including three clusters of historic buildings known as the Martin Gross campus, Clark Circle, and the Warfield Complex.

13.     By the late 1990s, the historic buildings in these three clusters largely sat vacant and began to deteriorate and fall into disrepair, and the State began to consider divestiture of the buildings.  Although SHC remained in operation on the balance of the campus—mostly within

3

more modern buildings—its physical footprint and operational mission was scaled down significantly. The State sought a more productive use of the shuttered portions of the SHC property that would contribute economically to the region and preserve historic structures on the hospital campus.

### A. The State conveyed the Warfield Complex to the Town of Sykesville for the purpose of redeveloping the property and preserving its historic buildings.

14.    On December 17, 1999, the Town of Sykesville (the "Town") and the State signed a Letter of Intent for the State to transfer the Warfield Complex, which is now known as Warfield at Historic Sykesville (the "Warfield Project"), to the Town. The Town acquired the Warfield Project pursuant to a Disposition and Development Agreement ("DDA"), which was executed in November 2002.[1] The DDA was recorded against the deed to the Warfield Project, and its many obligations imposed by the State remain in effect to this day.

15.    Although the DDA acknowledges the Town's original desire to develop the Property "principally as an employment center/office park," it states a contingency that "in the event that the Carroll County Public Water Supply becomes sufficient to sustain high-density residential development, **the Town shall investigate the feasibility of incorporating residential development into its plans for [the Warfield Project… [and] [i]f residential development is determined feasible, the Town shall employ reasonable efforts to incorporate residential options into the Project**…The State will consider the dedication of additional programmatic resources to [the Warfield Project] upon demonstration by the Town of the intent to incorporate and implement Smart Growth ideals." (Emphasis added). This water

---

[1] A portion of the property was conveyed back to the State for purposes of locating and constructing the Maryland Police and Correctional Training Center.

supply condition was satisfied in 2015 when the Warfield Project was allocated 142,000 gallons per day of water and sewer capacity.

16.    The DDA further requires that "the Town shall use reasonable efforts to design and develop [the Warfield Project] in accordance with Smart Neighborhood Protocols."

17.    Key excerpts from the DDA concerning Smart Growth Protocols include:

a.    As to the intent of the agreement, the DDA states: "The purpose of the smart neighborhood overlay is to encourage development that provides for a diverse mix and efficient arrangement of land uses and housing types."

b.    As to the "Permitted Uses" under the agreement, the DDA states: "Residential uses that contribute to housing type diversity, including condominiums, duplexes, multifamily, retirement, and townhouses."

c.    As to "General Development Standards," the DDA states: (a) "[S]mart neighborhood development shall seek to provide a mix of housing types… and should integrate different income levels into the design of, and distributed throughout, the community." (b) "The density should be maximized to reduce the costs of providing services and to encourage the growth of a neighborhood as a community." (c) "The smart neighborhood shall contribute to unmet commercial, housing, civic, and open space needs in nearby neighborhoods." (d) "The smart neighborhood development shall include some mix of commercial, office/employment, civic, recreational, and residential uses."

18.    For nearly two decades, the Town did little to nothing to comply with its obligations to the State to develop the Warfield Project in accordance with the DDA.

19.    The Town committed limited financial resources to protect or stabilize the historic buildings, which sat vacant and decaying for nearly two decades.

5

20.     Under its ownership, the Town did not undertake reasonable efforts to market the Warfield Project or otherwise identify users for the historic buildings. The Town refused to look at residential options for the Warfield Project, despite the fact doing so was demanded by the DDA and the fact that residential uses were the most viable of all potential uses for the Warfield Project.

21.     During the time it owned the Warfield Project, the Town never seriously investigated or considered the feasibility of residential uses within the Warfield Project in accordance with DDA.

22.     The Town's unwillingness to honor the DDA's residential use requirements was, in part, driven by significant undue pressure from Carroll County to prohibit housing development at the Warfield Project and to allow only non-residential development.

23.     This pressure stemmed from both the power differential inherent in the relationship between county and municipality and the fact that Carroll County was the Town's second largest creditor in connection with the Warfield Project, second only to the State of Maryland.

24.     Most of Carroll County's opposition was instigated by then-County Commissioner Doug Howard, who was the commissioner for the Freedom District, the County district where the Warfield Project is located. Howard was staunchly anti-housing and exerted great influence over the Purchase and Sale Agreement and land use negotiations, despite the Town having planning and zoning authority independent of Carroll County.

**B.  The Town's sale of the Warfield Project.**

25.     On April 27, 2014, a Purchase and Sale Agreement ("PSA") was signed, with the Town agreeing to sell the Warfield Project to the Warfield Collaborative, LLC, a group headed

by investor Roger A. Conley, who was and who remains the principal investor in the Warfield Project.

26.    The Warfield Project includes four vacant parcels (Parcels A, B, C, and H) and a parcel where the historic buildings are located (Parcel D).

27.    The sale did not close until June of 2018, when the Warfield Collaborative, LLC's successor entities, Plaintiffs Warfield Historic Properties, LLC and Warfield Historic Quad, LLC, paid approximately $8.2 million for approximately 63 acres, which comprise the Warfield Project.

28.    On June 26, 2018, Plaintiffs Warfield Historic Properties, LLC and Warfield Historic Quad, LLC and the Town entered into three inter-related agreements: 1) the Parcel D Preservation Agreement (the "Preservation Agreement"); 2) a Reversion Agreement (the "Reversion Agreement"); and 3) the Parcel D Escrow Agreement (the "Escrow Agreement"). These agreements were executed concurrent with closing under the PSA.

29.    Under the Escrow Agreement, Plaintiffs agreed to establish and fund three escrow funds, including the Parcel D Escrow Fund I, as defined in the Escrow Agreement. The purpose of the funds in the Parcel D Escrow Fund I, as set forth in Section 6 of the Escrow Agreement, was to distribute funds to the Purchaser to pay for costs and expenses incurred in connection with performing work to improve Parcel D. The Escrow Agreement does not allow the Town to use monies in Parcel D Escrow Fund I (or any of the escrow funds) for its own purposes. The only reason the Deed of Trust note was made in favor of the Town was because the PSA transaction was structured, for better or for worse, to have Parcel D Escrow I carried on the Town's balance sheet.

7

30.     The Town benefitted significantly from the sale of the Warfield Project, with sales proceeds going to, among other things, the repayment and resolution of over $7 million in debt owed by the Town to the State and Carroll County, including principal and accrued interest. Plaintiffs also reimbursed the Town for the Town's expenses in connection with the PSA. Plaintiffs spent nearly $700,000 paying the Town's legal expenses to clear title, resolve claims, and correct easements and other encumbrances to clear title.

31.     Plaintiffs also paid an eleventh-hour exaction imposed by the Town in the amount of $250,000 for town park improvements and $500,000 due from the Town to the State of Maryland Community Trust Fund.

32.     The Warfield Collaborative was diligent in its planning and marketing efforts immediately upon signing the PSA.

33.     The Warfield Collaborative and Plaintiffs made major investments in the Warfield Project and initially marketed the project as a primarily non-residential project. Their early focus on non-residential was largely driven by pressure being exerted by Carroll County on both the Town and Plaintiffs as they worked their way through obligations under the PSA in the run up to closing in 2018.

34.     The first major development within the Warfield Project was a 145-unit townhouse project known as Parkside at Warfield ("Parkside").  Parkside is substantially complete and completely sold-out. Sales prices at Parkside were in the mid- to high-$300,000 range when sales began in 2019 and rose to the mid-$500,000s when the last units were sold in 2022.

35.     While Parkside at Warfield has been successful, the State officials who reviewed the development plans have made it clear that a greater range of housing choices and price

8

ranges are necessary to support the housing demands of the surrounding area in accordance with the DDA.

**C.  The COVID-19 pandemic dramatically changed the market for new office and retail development.**

36.     In March 2020, the World Health Organization had declared COVID-19 a global health emergency. It was the greatest pandemic in over a century and paralyzed business operations throughout the world.

37.     The impact of COVID-19 on the development community was immediate and catastrophic.  Every aspect of development was impacted including construction, supply chain, lending, the availability of workforce, engineering, planning and design.  Like all developers, Plaintiffs were severely impacted by the pandemic.

38.     The long-term impact of COVID-19 on the Warfield Project is more significant. Large portions of the workforce began working from home and have not returned to the office. Landlords have reported extraordinarily high office vacancy rates, and many have been on the verge of foreclosure and bankruptcy.  Many major lenders will not finance new office construction.  The market for new office space largely disappeared.

39.     There has been a similar dynamic for retail uses.  Even before COVID-19, new retail construction dramatically decreased, primarily because of the rise of Amazon and other alternative home shopping services.  The pandemic exacerbated this trend, and retail vacancies have been at record high levels.  Many shopping centers have closed outright or converted to other uses.  Major financial institutions stopped most of their lending for new retail projects.

40.     Job growth, a primarily driver of commercial and industrial real estate demand, was anemic in Sykesville and Carroll County and the retail market was saturated prior to COVID-19, but the effects of the global pandemic dashed any reasonable hope that the Warfield

Project would be viable as a mixed-used project primarily focused on commercial, industrial, and retail development project.

**D. The Town's failure to develop and implement any meaningful affordable housing strategy.**

41.     In contrast to the collapse of new office and retail construction, the residential market has experienced a resurgence.   There is a housing shortage for all housing types across all price points and a particularly high demand for workforce housing.

42.     The workforce housing shortage is particularly acute in Sykesville and the region. There are only two existing properties of federally supported affordable housing that represent a combined 5% of the 1,600 housing units in Sykesville. Schoolhouse Road is a community of 26 Section 8 townhomes that opened in 1980, and Village House is a senior community of 54 apartments near the downtown area that opened in 2001. This combined 5% of affordable housing units is compared to the Town's Comprehensive Plan estimates of 25% of Town households at low income (0-60% of Area Median Income) and a combined 58% of households including those at workforce income levels (50-120% of Area Median Income).

43.     For years, the Town has failed to develop and implement any meaningful affordable housing strategy or approve zoning changes to permit residential development to increase its housing stock to provide housing choice, despite being legally obligated to do so.

44.     State law requires that comprehensive plans for all Maryland jurisdictions include a housing element and that local jurisdictions appropriately plan for both low-income and workforce housing for households earning 60% or less (Maryland's defined threshold for "low-income") and 50-120% (Maryland's defined threshold for "workforce") of Area Median Income.

45.     Additionally, the Town is in a State of Maryland Priority Funding Area, which makes it eligible for priority state investment to support future growth. As an extension of this,

10

the Town applied for Sustainable Community Area designation, which was granted by the State of Maryland in 2012 and renewed in 2017 and 2022. In short, Sustainable Community Areas receive priority funding from the State over non-designated areas and exclusive access to certain funding programs including funding through the State's Community Legacy Program and Strategic Demolition Fund. In return for its investment under these programs, the State expects that local jurisdictions will promote affordable housing, economic development, and historic preservation (among other things).

46.     The most recent federal Census confirms the lack of affordable housing. The 2020 Census reports the Sykesville total population as 4,316, a decline from the 2010 Census. Significantly, the 2020 Census reported 1,716 housing units in Sykesville, with an occupancy rate of 97%.  The Town's 2010 Master Plan reported that Sykesville had "the lowest number of vacant units in the region" (at that time, 98%).  This lack of accessibility can be directly linked to the Town's resistance to affordable housing.

47.     The 2020 Census reported that 66% of housing units are owner occupied. The Town's 2010 Master Plan noted that the percentage of renters in Sykesville had "steadily decreased" from 47% to 32%.  The median value of the housing units is 25% higher than the average in the statistical area, and more than 20% higher than the State average.

48.     Although there is indisputably a high market demand for affordable multi-family housing, the Town actively resisted allowing additional housing supply to meet this demand.

49.     One of the elements of a Sustainable Communities Plan is the municipal commitment to affordable housing. Performance against the benchmark set by the approved plan is supposed to guide State funding to local jurisdictions.  By any measure, the Town's affordable housing commitment has fallen short of any benchmark.

50.    Not only is there a shortage of affordable housing in the Town, but there is also a housing shortage in Carroll County and across the State.

51.    Carroll County has a current estimated housing shortage of 4,121. Because the Town is located in a growth area of the County—the Freedom District—it is highly likely that a higher share of these units would be expected in the Town than elsewhere in the County.

52.    Governor Moore's Housing for Jobs Act of 2025 (House Bill 0503) is currently being considered by the General Assembly. The Housing for Jobs Act seeks to address the growing issues of housing affordability and availability in the State, recognizing that Maryland's high housing costs are driven in large part by the housing shortage.

53.    The legislation acknowledges that Maryland's economy cannot grow without finding a way to address housing costs and availability. From 2019 to 2024, the number of houses that were for sale decreased by 59% each month, and there is a need for more than 150,000 housing units in the region to support job growth.

**E.  Plaintiffs' response to the collapse of the office and retail market.**

54.    In response to the extraordinary changes in commercial and retail demand, Plaintiffs made Herculean efforts to create a development proposal that would meet market demand, would be consistent with the State's vision for the Warfield Project, could be financed in this new environment, and would serve the Town and the larger community in a sustainable way, consistent with the culture of the community and the history of the Warfield Project and the DDA.

55.    Plaintiffs conducted feasibility studies, surveyed potential users and partners, met with stakeholders, and, importantly, led efforts to obtain State financing and other support to make the project feasible, even in a market that had profoundly changed.

12

56.    Plaintiffs developed a project concept that included a mix of residential and other uses that could actually be financed and constructed in this unprecedented new market and that addressed the significant cost of restoring empty historic buildings.

57.    To ensure that the project could be financed and sustainable, Plaintiffs undertook unprecedented efforts to obtain State financial support for the project for the enactment of SB 885, creating the Catalytic Revitalization Tax Credit ("CRTC"), designed specifically to support the Warfield Project and similar projects.

58.    In 2022, the State Department of Housing and Community Development ("DHCD") announced that the Warfield Project was the first recipient of the $15 million CRTC award.

59.    The DHCD has indicated that there is a strong prospect for substantial additional funding including, but not limited to, Federal Low-Income Housing Tax Credits ("LIHTC") of around $15 million and related tax-exempt housing bond financing estimated in excess of $20 million. In addition, the Warfield Project would be eligible for millions in historic preservation tax credits through the State and federal government.

60.    All of these incentives are necessary to overcome the high cost of preserving the Warfield Project's historic buildings and environmental remediation including extensive asbestos and lead abatement.

61.    The magnitude of state and federal support necessary to make the Warfield Project viable was widely understood by local, county, and state officials long before Plaintiffs' involvement and continue to be discussed ad nauseum with officials.

62.     The State has committed significant support including, without limitation, the CRTC.  DHCD Secretary Kenneth C. Holt, who served as secretary from 2015 to 2022, strongly supported the redevelopment effort, stating that

> The redevelopment at Warfield presents a once in a lifetime opportunity for the people of Sykesville to preserve a piece of their heritage by transforming the former Springfield Hospital Center into a residential and commercial hub that will enhance the local community, while preserving prime and productive Carroll County farmland and open space.

63.     This strong support has continued under the Wes Moore Administration.

64.     Despite strong State support, the Warfield Project has been jeopardized by the active resistance of the Town's Mayor and Town Council.

65.     Redevelopment of the Warfield Project is financially impossible without significant State and Federal support.

66.     Market studies, lender surveys, feasibility studies have made it unequivocally clear that the Warfield Project cannot be redeveloped without a strong housing component and State financing for affordable housing.

67.     The Town has remained adamantly opposed to the very elements necessary to make the Warfield Project successful. Without access to both state and federal tax credits, including affordable housing tax credits and the tax-exempt bond financing, grants, and other incentives that typically accompany such tax credits, the unrestored historic buildings cannot feasibly be rehabilitated nor is the overall Warfield Project financially viable.

68.     The Town's failed stewardship of the property for 16 years makes it evident that the private market will not respond without major public support.  During that time, the Town was unable to attract any significant commercial, industrial, or retail investment. What little interest the Town was able to garner was from small commercial users that have brought limited

economic impact to the Town, County, and State, under terms that reduced the potential value of the Warfield Project. DHCD support will not occur without a strong housing component per the DDA and other State programs and requirements. State financial support, including tax credits, tax-exempt bond financing, and grants cannot be obtained without a significant housing component.

69.    Recognizing these economic realities, Plaintiffs developed a mixed-use proposal consistent with the State's vision for the property, and was creative, sustainable, and could be financed.  This included repurposing vacant historic buildings as 177 +/- workforce housing units and adding additional 49,000 +/- SF of non-residential space which would be included primarily to support the Town's desire to increase the commercial component from the existing 28,000 SF in three office buildings.

70.    Plaintiffs also proposed a new construction component, consisting of 20 +/- acres of currently vacant parcels, for the construction of market-rate housing, including townhouses, two-over-two condominiums, and possibly a senior housing project consisting of independent and assisted living units along with a dementia care component. The market-rate housing proposed under Plaintiffs' plan would allow development of a number of different housing types at a range of price points promulgated by the DDA.

**F.  The Town has consistently refused to meaningfully consider or even discuss any reasonable proposal for the redevelopment of Warfield.**

71.    Plaintiffs were successful in identifying and/or securing millions of dollars in financial incentives to make the Warfield Project viable and sustainable, but these incentives cannot be fully realized without the Town's good faith cooperation and willingness to comply with the DDA and other State policies and directives.

15

72.    Plaintiffs attempted to meet with the Town's Mayor, Stacy Link, and Town leaders in order to develop a consensus behind a development proposal for the Warfield Project that would viable, sustainable, and consistent with the DDA. To be viable and sustainable, a project must be capable of securing financing, meet market demand, and earn a reasonable return for investors.  No development project can be successful without meeting these benchmarks.

73.    Instead, the Town, largely through the actions of Mayor Link, acted in a concerted way to prevent any cooperation and to block and prevent the objective of the Agreements and the DDA.

74.    Mayor Link and the Town acted in bad faith and dealt unfairly with Plaintiffs with the express and stated purpose of reverting the Warfield Project back to the Town and causing unjust enrichment to the Town, despite the fact that Plaintiffs had paid $8.2 million for the Warfield Project and have since invested millions of dollars to enable its future development.

75.    Mayor Link consistently refused to meet with Plaintiffs to discuss what type of development might reasonably meet these objectives and to gain a general understanding of the complexities of developing such a large, multi-faceted project. While Mayor Link made many public and private statements against the Plaintiffs, the Plaintiffs' principals, and their efforts with respect to the Warfield Project, and has spoken with many others about the Warfield Project, she has consistently refused to communicate with the Plaintiffs concerning the Warfield Project.

76.    Further, Mayor Link has undertaken extraordinary efforts, both public and private, to disparage both Plaintiffs and the Warfield Project.

77.    Mayor Link's refusal to consider the project in a fair and open-minded manner was not surprising.  As a candidate for mayor in 2021, she campaigned on the theme of "taking

16

the project back," in other words, wresting control of the Warfield Project away from Plaintiffs and having the Town reassume ownership through any means possible.

78.     However, somewhat surprising was Mayor Link's departure from the course of dealing established between Plaintiffs and the Town's mayor. Prior to Mayor Link's election as mayor and going back to the negotiation of the PSA in 2013 and 2014, meetings between the Town mayor and Plaintiffs (which occurred sometimes with, but just as often without, the Town manager and/or Town attorney) were commonplace to discuss, negotiate, and collaborate on important issues and details concerning the Warfield Project prior to introduction in a public forum.

79.     Such meetings between counterparties in contractual and/or business relationships and elected officials (particularly those with significant delegated authority and/or in smaller jurisdictions) are commonplace.

80.     It is clear that the Town's resistance is motivated to a great degree by opposition to residential development, affordable housing in particular, and an animus toward residents of affordable housing projects. Town officials and individuals close to Mayor Link and other Town officials have made many comments in opposition to affordable housing options including:

   a.  "Nobody wants more housing, especially rental housing and particularly low-income
       housing."

   b.  "We only want people who can afford to buy a house."

   c.  "There's only one large rental complex [of 250 apartments] and that's where all the
       crime is; drugs, domestic problems, etc."

   d.  "The Town does not want transients [renters] to become more of a force. The
       interests of renters are not the same as property owners."

   e.  "Those people can come from any other place with a voucher and live here. There's a
       shortage of housing in many areas and that's why coming to Sykesville is attractive to

17

those people to live in our community and come to our schools." (Former Town Mayor Ian Shaw).

81.    In addition to refusing to discuss the Warfield Project, the Town provided minimal staff analysis of the impact of the project or potential alternatives, the significant financing and marketing issues associated with the project, obligations under the DDA, or the Town's contractual obligations. Mayor Link also has continuously made active efforts to impede the Warfield Project, foment opposition, and impugn the Plaintiffs and their principals and consultants, and prevent a vigorous and balanced public conversation about an economic development project of great significance to the Town, County, and State.

82.    Mayor Link has gone to extraordinary lengths to prevent the DDA from being implemented and seeking to retake Plaintiffs' property, including changing the municipal code over the Christmas holiday, without public input, in order to place on the Planning Commission a non-resident because of his avowed opposition to the Warfield Project; conducting private meetings with businesses and citizens to foment opposition to the Warfield Project; providing false, unvetted, self-generated and exaggerated school impact estimates concerning the project; and defaming Plaintiffs and their principals.

83.    The ordinance to add a non-resident alternate member to the Planning Commission was introduced at the December 12, 2021 Mayor and Town Council meeting and acted upon at the Mayor and Town Council's January 10, 2022 meeting. This measure was introduced in response the departure of the long-standing Planning Commission Chairman to a jurisdiction outside of Carroll County, a staunch anti-housing voice on the Planning Commission.

84.    Mayor Link has also attempted to interfere with contractors and others who had potential business relationships with Plaintiffs. She personally called at least two of Plaintiffs'

18

key contractors, improperly asking them to provide her with proprietary and confidential information, including reports, contracts, and status of work at and in connection with the Warfield Project.

85.    During those calls, Mayor Link disparaged Plaintiffs on multiple fronts, told these contractors that the Town would soon own the property, and that it was possible that these contractors might not be paid by Plaintiffs. Mayor Link's interference and defamation impeded the Plaintiffs' preservation efforts among other things.

**G. The Town's actions as to the Zoning Text Amendment.**

86.    Despite the ongoing opposition and lack of cooperation from Mayor Link to both Plaintiffs and the Warfield Project, Plaintiffs pressed ahead to amend the Warfield Project's zoning.

87.    Plaintiffs filed a petition for zoning text amendment (the "Zoning Text Amendment") with the Town on December 13, 2021, to, among other things, modify portions of the Planned Employment Center ("PEC") district to allow for a shift in development density from commercial to residential.

88.    The petition was based largely on the provisions of the DDA, which makes clear the State's preference for housing over non-residential uses to the point of establishing that a more housing-focused project is a condition precedent to the dedication of State financial incentives to the Warfield Project.

89.    The Zoning Text Amendment petition was further supported by years of experience by the Town and Plaintiffs unsuccessfully marketing the Warfield Project as a commercially-focused project and numerous studies including third-party market, fiscal impact, economic impact, land planning, engineering, and architectural studies.

90.    The Zoning Text Amendment would have allowed Plaintiffs to develop the Warfield Project for residential uses. Parcels A and B, which total 5.971 acres, would support 70 townhouses, 110 two-over-two stacked townhouses, or other uses, including senior housing. Parcels C and H, which total 8.717 acres, would support 105 townhouses or 160 two-over-two stacked townhouses. Parcel D, where the historical buildings are located on 17.75 acres, would have supported 177 multi-family units for workforce housing.

91.    Despite the extensive analysis and effort associated with the Zoning Text Amendment, Mayor Link and the Town refused to discuss it or negotiate in any way.  The Town failed to provide any fair process normally associated with municipal land use applications and required by state law, which is especially concerning given that the Town had a contractual obligation to act in good faith under its agreements with Plaintiffs.

92.    Immediately after Plaintiffs filed the Zoning Text Amendment, Mayor Link began meeting with various business owners and residents to disseminate her opposition to the zoning change.

93.    During the five months between the submission of the Zoning Text Amendment and the public hearing on May 3, 2022, while still refusing to meet with Plaintiffs except in Mayor and Town Council meetings, Mayor Link personally met on numerous occasions with various groups of residents, business owners, and others about the Warfield Project. Mayor Link was often the only speaker about the Warfield Project and communicated unsubstantiated projections, invective about the motives of Plaintiffs, and incorrect information about the Warfield Project and its progress.

94.     In many cases the information she presented was at odds with formal reports, studies, and testimony in public meetings – instead giving her personal, largely negative interpretation. Representative statements in these meetings included:

a.  "These guys have already made back all of their money" – despite millions invested.

b.  "I don't trust these guys at all. If they told me my mother loves me, I wouldn't believe them."

c.  "They've done nothing to protect these historic buildings" – despite almost $1 million from the escrow funds being spent and much more on additional efforts outside of the escrow funds.

d.  When the developer created a non-profit community development corporation to facilitate grants to and working with local non-profit organizations at DHCD's recommendation, Mayor Link stated, "Everything is a tax dodge with these guys."

95.     As the May 3, 2022 public hearing date on the Zoning Text Amendment got closer, Mayor Link held additional meetings to encourage attendance at the public hearing in opposition to the Zoning Text Amendment, specifically soliciting negative public testimony regarding the proposed changes to shift approved density from commercial uses to residential. Meetings in April 2022 included one with approximately 20 business owners affiliated with the Downtown Sykesville Connection, a local merchant group and various members of the community.

96.     Another such meeting was held at the Parkside at Warfield townhouses on April 28, 2022. The Town printed flyers that were delivered to residents' doorsteps. The flyers stated that two elected officials—the Mayor and a councilperson—would be holding a "public information meeting" in an outdoor common area to explain the Zoning Text Amendment and to take questions.

97.     Approximately 40 people attended the meeting and Mayor Link explained that she wanted to "dispel misinformation about the zoning petition" that she referred to as "upzoning." She did not use any of the analysis, projections, or conclusions from Plaintiffs'

third-party studies, some of which the Town had required. Instead, using apparently self-generated exaggerations of potential impacts, she described an extreme example of housing density that would increase the Town's population by 48% and said that school crowding would result. Mayor Link stated that Plaintiffs tried to "sneak[]" in certain language in the Zoning Text Amendment but that she "found it."

98.     Mayor Link disparaged the Warfield Project, Plaintiffs, and the Zoning Text Amendment, and she stated that she was working to build opposition to the Zoning Text Amendment. When asked by an attendee how the other council members felt about the Zoning Text Amendment, she replied, "At least five of us are as pissed off as you are" and invited the attendees to come to the hearing and speak out in opposition to help her "stop them in their tracks."

99.     Mayor Link's active efforts to build opposition to the Zoning Text Amendment from the outset was unprecedented and is unlawful and demonstrates bad faith.

100.     The Town routinely shifted hearing dates, took the project on and off the agenda at the last minute, and failed to provide any significant hearing to allow Plaintiffs to present the details of a project of this magnitude.

101.     The Mayor and Town Council took up the Zoning Text Amendment at its regularly scheduled meeting on January 24, 2022. After a presentation by Plaintiffs and discussion, the Mayor and Town Council voted to refer the Zoning Text Amendment to the Town of Sykesville Planning Commission (the "Planning Commission") with instructions limiting the scope of the Planning Commission's evaluation and review and tying the Planning Commission's hands in a manner not authorized by the Town's Code or State law.

102.     The Mayor and Town Council and the Planning Commission each have a distinct role to play in the process of considering petitions such as the Zoning Text Amendment for review and

adoption. The Planning Commission is an independent body established under provisions of the Land Use Article of the Annotated Code of Maryland and the Town Code. The Planning Commission's role is to publicly and independently evaluate applications such as the Zoning Text Amendment and prepare a report and recommendation to the Mayor and Town Council.

103.    After receipt of the Planning Commission's independent report and recommendation, the Mayor and Town Council is charged with considering the merits of the Zoning Text Amendment, taking into account, among other things, the Planning Commission's independent report and recommendation and conducting a public hearing on the matter.

104.    When the project was finally referred to the Planning Commission, the Mayor and a majority of Council members made an unprecedented appearance at two Planning Commission meetings and had vigorous *ex parte* communications with the commissioners to ensure that the project would be defeated, all of which was captured on the Town video system and in text messages obtained by the Maryland Public Information Act.

105.    This included Mayor Link texting the Planning Commission staff liaison asking if a councilmember could move for a five-minute recess so that Mayor Link could talk to that councilmember and to the chairman of the Planning Commission outside of the public meeting and out of view of the cameras streaming the meeting.

106.    The actions of the Mayor and Council were so severe that the Maryland Open Meetings Compliance Board found that the conduct violated the State's Open Meetings law, a ruling that the Town unsuccessfully appealed to the Circuit Court for Carroll County.

107.    Mayor Link's conduct on that evening and her conduct towards the Plaintiffs and the Warfield Project generally since her election have made it impossible for Plaintiffs to obtain a fair hearing or due process either before the Planning Commission or the Mayor and Town Council.

108.    The Planning Commission voted in opposition to the Zoning Text Amendment on April 4, 2022, and sent the matter back to the Mayor and Town Council with a negative recommendation. At its regularly scheduled meeting on April 11, 2022, the Mayor and Town Council set a public hearing for May 2, 2022.

109.    In response to the public hearing and the Town's continued opposition to the Zoning Text Amendment, the Secretary of Maryland Department of Housing and Community Development ("DHCD") convened a meeting at the Sykesville town offices. The Secretary brought his senior executive team from DHCD including his deputy secretary, chief of staff, and chief policy officer to address the status of the Warfield Project, to explain how successful projects are financed, and to attempt to break the deadlock. Other participants included the Mayor Link, the Town attorney, Town manager, the Town council president, Plaintiffs' principals, land planner, counsel, and state government affairs advisor.

110.    At this meeting, DHCD representatives reiterated, among other things: (1) DHCD's strong support for the Warfield Project; (2) DHCD's willingness to make major new investments into the Warfield Project as contemplated in the DDA; (3) the importance of residential development to the success of the Warfield Project consistent with the DDA; (4) DHCD's commitment to additional affordable housing in the Town; (5) the Town's contractual commitment to housing at the Warfield Project as a condition of receiving the property from the State under the DDA; (6) DHCD's willingness to consider additional financial and other support from the State for the Town projects not directly connected with the Warfield Project; and (7) the importance of reaching agreements on the Warfield Project immediately as to not further delay the project.

111.    Twelve days later, on June 21, 2022, the Mayor and Town Council were "briefed" in public meeting about the DHCD meeting. The briefing concerning the two-and-a-half hour

24

DHCD meeting lasted only one minute and twenty-five seconds with another twenty minutes of conversation amongst the Mayor and Town Council based on the scant report. Shortly thereafter, the Mayor and Town Council summarily rejected the Zoning Text Amendment without any meaningful discussion or justification.

112.    This denial, along with Mayor Link's and the Town's other actions, placed in jeopardy the State's $15 million tax credit commitment to the Warfield Project, as well as the prospect of substantial additional State and federal support as outlined by DHCD officials at the June 9, 2022 meeting.

113.    The Zoning Text Amendment was the legal predicate for the Plaintiffs' ability to move forward with the development of the Warfield Project. The Town's failure and refusal to reasonably address the proposed Zoning Text Amendment prevented the Plaintiffs from: 1) moving ahead with developing the Warfield Project, which required the zoning entitlements to proceed as a matter of law; 2) prevented Plaintiffs from obtaining financing because lenders require the approval of the zoning entitlements prior to making loan commitments; and 3) prevented the Debtors from utilizing the substantial financial commitments of the State.

114.    Despite clear contractual requirements to work in good faith with Plaintiffs, the Town intentionally refused to do so. The Town refused to discuss or negotiate in good faith planning and zoning issues or the economic feasibility of Plaintiffs' proposal or any alternatives.

115.    Despite publicly rejecting Plaintiffs' plans for the property and interfering with the Planning Commission's consideration of the Zoning Text Amendment, Mayor Link had not taken any steps to analyze the feasibility or marketability of her desired uses for the property. Mayor Link has testified that she did not make any efforts to determine what the absorption rates were for residential development for the Warfield Project, to determine the marketability of the Warfield Project for any purpose, to determine the best use or combination of uses for the Warfield Project, to

25

determine the availability of adequate infrastructure facilities and public services for the Warfield Project, or to determine whether the residential development within the Warfield Project would be compatible with the Town's 2030 Comprehensive Plan.

116.    Mayor Link acknowledged that neither she nor the Town had done any inquiry into whether there was a market for retail at the property, whether there was a market for commercial uses at the property, or whether there was a market for a hotel at the property. In fact, she testified that neither she nor Town had done anything to investigate what kind of market exists for the uses that they were pushing to have at the site, specifically commercial and retail use. Mayor Link also testified that she had not made any inquiry or evaluation into how the Covid-19 pandemic impacted the market demand for commercial and retail uses or lender and equity investor appetite for investment in the Warfield Project.

117.    The Town's 2030 Comprehensive Plan was adopted in June 2021. The Warfield Project is repeatedly mentioned in the Comprehensive Plan.

118.    The Comprehensive Plan provides that a hybrid form-based zoning policy should be adopted, in which the form of a building and function is prioritized over the specific use. This encourages flexibility in allowable uses for a site and serves to "accommodate[] changes in the real estate market." The Town's opposition to the Warfield Project contradicts the principles of a form-based zoning policy.

119.    The Comprehensive Plan recognized that the "vacant historical buildings will continue to deteriorate" and that the Town needs to embrace "financially viable redevelopment strategies."

120.    The Comprehensive Plan cites to a study that had been commissioned by the Town from Sage Policy Group in 2020, which found that there was "an overall market downturn for office space" as a result of Covid-19, and that proposed office space was "challenging" and that "complete

26

absorption may require two decades or longer." Later in the Comprehensive Plan, the Town determined that, given Carroll County's net absorption of office space during the period of 2010-2019 averaging 7,475 square feet per year, it would take 38 years for Warfield to absorb the amount of office space proposed in the current Master Plan assuming that the Warfield Project was able to capture 100% of market demand.

121.    The Town's insistence on non-residential uses for the Warfield Project contradicts its Comprehensive Plan. The Comprehensive Plan acknowledged that "[t]ownhome development of Parcels E-F has been successful," but that "challenges associated with retail development of Parcels A-B and office development for Parcels C, D, and H are considered difficult in terms of the Carroll County sub-market to the larger Baltimore market and the substantial cost associated with building restoration."

122.    The Town recognized in the Comprehensive Plan that there is market demand for efficiency one- and two-bedroom apartments that are smaller in size and that "infill development in the Downtown and future development offer an opportunity to include a range of housing types."

123.    In considering retail, the Town acknowledge in the Comprehensive Plan that the town of Eldersburg, which is 3.5 miles north of the Town, is already established as "the major commercial center for retail in southern Carroll County" and "will continue to serve as the retail hub for the area."

124.    Following the adoption of House Bill 1045 in 2019, jurisdictions were required to include a housing element when developing new or updated comprehensive plans after June 1, 2020. Municipalities are required to "appropriately plan for both workforce housing and low-income housing for 'low-income' households and 'workforce' households." The Comprehensive Plan stated that households in the Town earning less than $50,000 per year were considered low income (26% of households) and households earning between $50,000 and $124,999 per year were considered

workforce (36.3% of households). The Comprehensive Plan concluded that the Town must appropriately plan for both workforce housing and low-income housing.

125.     The Warfield Project is the last major development opportunity for the Town to accomplish the goal set forth in the Comprehensive Plan to adopt an inclusionary housing approach through zoning.

126.     Plaintiffs would have developed the Warfield Project for residential uses, including townhouses and multi-rentals. As a result of the Town's conduct as to the Zoning Text Amendment, Plaintiffs have suffered damages of more than $20 million. This includes lost value damages in limiting Parcels A/B, C/H, and D in the Warfield Project to just commercial uses and lost opportunity costs. Plaintiffs also incurred carrying costs because, if the Town had approved the Zoning Text Amendment in 2022, Plaintiffs would have been able to sell Warfield Project then and invested that money.

127.     If the Zoning Text Amendment had been approved and Parcel D developed for residential uses, there would have been available tax credits totaling more than $31 million, including Federal Historic Tax Credits, Catalytic Revitalization Tax Credits, and Federal Low Income Housing Tax Credits, and Plaintiffs would have received tax exempt bond financing of at least $20 million and millions of dollars in State grants.

128.     On April 25, 2024, the Housing Expansion and Affordability Act (HB538) ("HEAA") was approved by the Governor of Maryland in an effort to make housing more affordable and accessible. HEAA went into effect on January 1, 2025. As a result of the enactment of HEAA, there is no longer a need for Plaintiffs to obtain a Zoning Text Amendment or any rezoning in order to proceed with their proposed uses and density for the Warfield Project.

**H.  The Town's interference with State grants.**

129.    Mayor Link and the Town actively obstructed $2.25 million in State grant funds that would have enabled Plaintiffs to fully perform under the Escrow Agreement and Preservation Agreement, including payment in full of the $1 million Deed of Trust Note and full deployment of $2.8 million in escrow funds over the three escrow accounts in improvements to the Warfield Project's historic structures. More significantly, these grants, which were already fully committed by the State, would have enabled total investment of up to $4.9 million in the stabilization and environmental remediation of the historic structures after matching required under the Preservation Agreement.

130.    The need for State funding from grants (among other sources) to help offset the high cost of stabilizing, remediating, and renovating the Warfield Project's historic buildings was understood by all parties. Plaintiffs identified grant support available from DHCD, and aggressively pursued this support by developing a relationship with DHCD. The DHCD secretary and his senior staff encouraged Plaintiffs to apply for grant funding through their community development programs and indicated that with successful grant applications that DHCD could provide at least $750,000 grants each year for three years. At the time, DHCD program staff encouraged working through the Town as an intermediary to simplify the funding process.

131.    Plaintiffs submitted a successful grant proposal in 2019 and was awarded the first $750,000 grant. When the Mayor and Town Council convened to discuss and act on the grant award, Mayor Link (who was then a councilmember) decided to oppose the awarded funds because she wanted the Town to have more control over how the grant funds were used at the Warfield Project, among other reasons. Most Councilmembers thought it unwise to reject an investment in the Warfield Project. Despite then-Councilmember Link's opposition,

29

the Town agreed to accept and manage the award as the intermediary for Plaintiffs.

132.    This first grant was never put to work in the Warfield Project because the Town refused to transfer the funds in a tax-efficient manner. The grant sat unfunded for a period of time as a result, and the first $750,000 grant award was ultimately released by the DHCD Secretary to the Town for other uses as a gesture of goodwill to encourage the Town to cooperate with Plaintiffs. The Town was allowed to use this award on unrelated Town projects in the downtown area. None of the $750,000 award was spent in support of the Warfield Project.

133.    After the controversy with the Town over the first DHCD grant, DHCD suggested that the Plaintiffs identify a non-profit partner to act as a conduit for future grant awards. The State required all grant funds to be distributed to and administered by either a local jurisdiction or a non-profit.  Plaintiffs identified Community Foundation of Carroll County ("CFCC") and submitted two additional grant applications, receiving awards for fiscal years 2022 and 2023 totaling $1.5 million.

134.    Mayor Link successfully disrupted the relationship between Plaintiffs and CFCC, ultimately leading to Plaintiffs losing another $1.5 million in grants committed to the Warfield Project by the State. Eighteen months after establishing the working relationship, CFCC suddenly withdrew from the arrangement. Upon information and belief, the Town's vocal opposition, particularly the opposition of Mayor Link, to the Warfield Project was a significant factor in CFCC's withdrawal.

135.    Plaintiffs then were forced to scramble to partner with the Real Estate Charitable Foundation of Maryland ("RECFM") and its parent Community Foundation of Howard County ("CFHC") to administer both the fiscal year 2022 and 2023 grants. Grant funds totaling $1.5 million were to be directly spent on the unrestored historic buildings of Parcel D.

136.     In Spring 2023, Plaintiffs were suddenly informed that the 2022 and 2023 grants of $1.5 million were being suspended. Upon information and belief, these grants were suspended due to Mayor Link's active opposition to the Warfield Project, including, but not limited to, directly disparaging the Warfield Project, Plaintiffs, and Plaintiffs' principals to State officials.

137.     Despite extraordinary efforts by the Plaintiffs to obtain State and federal funding for historic preservation, the Town provided no support whatsoever for these grant applications. Instead, its aggressive conduct has motivated partners and stakeholders to divert these grant proceeds to the Town and defer funding commitments for historic preservation.

138.     The Town's active opposition to Plaintiffs' proposals has been a major obstacle in obtaining funding that would significantly address historic preservation, and in particular address the deterioration of the historic buildings which occurred as a result of the neglect by the Town during the 16 years it controlled the property.

**I.    The Town's interference with the grant from the Carroll County Department of Economic Development.**

139.     At the outset of the Warfield Project, the Town required that a Fiscal Impact Study be conducted to evaluate costs and economic benefits to the Town, County, and the County's school district for the proposed development.

140.     Plaintiffs invited proposals from key providers, including Sage Policy Group and TischlerBise, to conduct the Fiscal Impact Study. The Town insisted on using TischlerBise, a fiscal, economic, and planning consulting firm, despite its significantly higher price than the other providers being considered. The Town contracted with TischlerBise in order to directly control the study approach.

141.     The first report was completed in May 2014. TischlerBise was paid $30,000 for the work.

142.    In July 2016, the Town required an updated report be prepared by TischlerBise pertaining to updated conditions.

143.    Neither of these reports included any analysis of economic development impacts to local businesses. They did not include any analysis of local market conditions to evaluate the feasibility of various land uses proposed for the Warfield Project.

144.    In 2019, Plaintiff Warfield Restorations, LLC sold a small building on Parcel D, Building H, to Alderson Loop. Building H was formerly used as a dance studio. Alderson Loop is an early-stage tech support firm that the County's Department of Economic Development was taking great strides to attract to the County.

145.    In order to attract Alderson Loop, the Department of Economic Development agreed to provide the Warfield Project with a $200,000 reimbursement for various marketing, evaluation, repairs, and other work on the historic buildings on Parcel D.

146.    The Department of Economic Development agreed to provide Plaintiffs a grant of $30,000 to prepare an updated Fiscal Impact report to include the missing elements pertaining to economic impact and local market data. The Department asked Plaintiffs to work through the Town to receive the funds in order to simplify the contracting process.

147.    When the funds were received by the Town, the Town proceeded to select a different consultant, Sage Policy Group, without telling or consulting with Plaintiffs. Sage Policy Group lacked the years of experience related to the Warfield Project that TischlerBise had. The Town also did not include the critical analyses of economic impact and market analysis as part of the updated Fiscal Impact report, even though those were the reasons for the requested study in the first place.

148.     To correct the deficiencies in the report, Plaintiffs paid for another update from TischlerBise in 2021.

149.     Despite these many reports over the years, and more than $100,000 in costs, none of the information in these reports were incorporated by the Town in its evaluation of the requested Zoning Text Amendment.

**COUNT I**
**Breach of Contract – Implied Covenant of Good Faith and Fair Dealing**

150.     Plaintiffs hereby adopt and incorporate by reference all the allegations in the paragraphs of this Complaint as though set forth fully herein.

151.     At all times mentioned, Plaintiffs and the Town were subject to a series of contractual agreements which apply to various aspects of the Warfield Project, including the Purchase and Sale Agreement, the Preservation Agreement, the Escrow Agreement, and the Reversion Agreement (collectively, "the Warfield Agreements.")

152.     Under the Warfield Agreements, the Town had an implied duty of good faith and fair dealing, including a duty to cooperate with Plaintiffs so that all parties may obtain the full benefit.

153.     The duty of good faith and fair dealing applies with particular force where one party, such as the Town here, exercises discretionary authority under the contract.  In this case the Town's discretionary authority to approve rezoning and text amendment proposals was subject to an implied duty of good faith and fair dealing.

154.     The Town violated its duty of good faith and fair dealing by failing to cooperate with Plaintiffs in any way to fairly consider and approve an application for a Zoning Text

Amendment proposed by Plaintiffs that was consistent with the DDA or otherwise advance the Warfield Project.

155.   The Town violated its duty of good faith and fair dealing by failing to meaningfully consider any of Plaintiffs' proposals, failing to provide a fair hearing, denying Plaintiffs due process as required by State law, interfering with the Planning Commission's consideration of the Zoning Text Amendment and violating the State's Open Meetings law, refusing to meet with Plaintiffs to have good faith discussions about the advancement of the Warfield Project, refusing to consider any proposal for the Warfield Project that would be viable, sustainable, and consistent with the DDA, interfering with State grants, and the other acts and omissions described herein.

156.   Instead, the Town, largely at the direction of Mayor Link, acted in a concerted way to prevent any cooperation and to block and prevent the objective of the Warfield Agreements and the DDA, which was the successful development of the project.

157.   Mayor Link and the Town acted in bad faith and dealt unfairly with Plaintiffs with the express and stated purpose of reverting the Warfield Project back to the Town and causing unjust enrichment to the Town, despite the fact that Plaintiffs paid $8.2 million for the property and have since invested significant sums in its future development.

158.   Mayor Link and the Town have disparaged Plaintiffs and the Warfield Project and taken other efforts to impede the Warfield Project, including interfering with contractors and other individuals and entities that have business relationships or potential business relationships with Plaintiffs.

159.   As a direct and proximate result of the Town's breach of good faith and fair dealing, Plaintiffs have suffered severe economic loss, the risk of their $8.2 million purchase

price and additional investments since 2014, lost economic opportunity, project delays, carrying

costs, continued degradation of the historic buildings, lost revenue, lost grants, and damage to

their reputation, all to their detriment.

WHEREFORE, Plaintiffs Warfield Historic Properties, LLC, Warfield Historic Quad,

LLC, Warfield Restorations, LLC, Warfield Center, LLC, and Warfield Properties, LLC

respectfully request that the Court enter judgment against Defendant Town of Sykesville and

award damages in an amount exceeding $75,000, including but not limited to $20,400,000, and

for such other and further relief the Court deems appropriate.

## COUNT II
### False Light

160.     Plaintiffs hereby adopt and incorporate by reference all the allegations contained

in all of the paragraphs of this Complaint as though set forth fully herein.

161.     Mayor Link has repeatedly made false and defamatory statements about Plaintiffs,

their principals, and the Warfield Project.

162.     She has made false statements about the costs of the Warfield Project and the

impact of the Warfield Project.

163.     She falsely stated that Plaintiffs had done nothing to protect the historic buildings

on Parcel D.

164.     She falsely stated that Plaintiffs had created a non-profit community development

corporation as a "tax dodge," and that Plaintiffs had taken other action to "dodge" taxes.

165.     Mayor Link made these defamatory statements at public meetings she organized

in order to draw up support in opposition to the Warfield Project and through the Town's

newsletters.

166.    Mayor Link called contractors who had business relationships with Plaintiffs and other entities that had potential business relationships with Plaintiffs and falsely stated that the Town would soon own the property and that Plaintiffs may not pay the contractors or other entities.

167.    Mayor Link used Town resources to disseminate these defamatory statements.

168.    The Town is vicariously liable for the defamatory statements made by Mayor Link.

169.    None of these statements are true and were made with actual malice by the Town in order to harm Plaintiffs and the Warfield Project.

170.    The Town improperly publicized false statements about Plaintiffs and the Warfiled Project, which placed them in a false light.

171.    The Town knew that the facts publicized about Plaintiffs and the Warfield Project were false or publicized them with a reckless disregard for the truth or falsity of those facts.

172.    The publication of these statements would be highly offensive to any reasonable person.

173.    The Town made the statements with actual malice. The Town acted with, and were motivated by, the knowledge that these statements were false and with the intent to cause harm to Plaintiffs and the Warfield Project, including harming Plaintiffs' reputation and the reputation of their principals and with the purpose of wresting control of the Warfield Project back to the Town.

174.    In the alternative, the Town made these statements with a reckless disregard for the truth or falsity of these statements and with the intent to cause harm to Plaintiffs and the Warfield Project.

36

175.     As a direct and proximate result of the Town's conduct, Plaintiffs have suffered severe economic loss, the risk of their $8.2 million purchase price and additional investments since 2014, lost economic opportunity, project delays, carrying costs, continued degradation of the historic buildings, lost revenue, lost grants, and damage to their reputation and goodwill, all to their detriment.

WHEREFORE, Plaintiffs Warfield Historic Properties, LLC, Warfield Historic Quad, LLC, Warfield Restorations, LLC, Warfield Center, LLC, and Warfield Properties, LLC. respectfully request that the Court enter judgment against Defendant Town of Sykesville and award damages in an amount exceeding $75,000, including but not limited to $20,400,000, and for such other and further relief the Court deems appropriate.

### COUNT III
**Tortious Interference with Prospective Advantage**

176.     Plaintiffs hereby adopt and incorporate by reference all the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

177.     Mayor Link called contractors who had business relationships with Plaintiffs and other entities that had potential business relationships with Plaintiffs in order to disparage the Plaintiffs and interfere with these contractors and businesses working with the Plaintiffs.

178.     Mayor Link falsely stated during these calls that the Town would soon own the property and that Plaintiffs may not pay these contractors and businesses.

179.     She also asked the contractors and businesses that had business relationships with Plaintiffs to provide her with proprietary and confidential information, including reports, contracts, and status of work and in connection to the Warfield Project.

180.    Mayor Link also interfered with the relationship between Plaintiffs and the Community Foundation of Carroll County ("CFCC"). The CFCC was a non-profit partner to act as a conduit for grant awards to Plaintiffs.

181.    Upon information and belief, the Town's defamatory statements about Plaintiffs and the Warfield Project were a significant factor in CFCC's withdrawal from the business arrangement with Plaintiffs.

182.    Plaintiffs then partnered with the Real Estate Charitable Foundation of Maryland ("RECFM") and its parent Community Foundation of Howard County ("CFHC") to administer both the fiscal year 2022 and 2023 grants, which totaled $1.5 million.

183.    Upon information and belief, the Town's defamatory statements about Plaintiffs and the Warfield Project were a significant factor in CFCC's withdrawal from the business arrangement with Plaintiffs.

184.    The Town was aware that Plaintiffs had business relationships and prospective business relationships with these entities.

185.    This was a conscious effort of planning by the Town to harm Plaintiffs' reputation and goodwill, harm Plaintiffs' State grant funding, and impede Plaintiffs' preservation efforts.

186.    As a function of having business relations with these entities, Plaintiffs had a reasonable expectation of continued economic benefit from their business relationships.

187.    The conduct of the Town in communicating with the contractors, businesses, and non-profits was intentional, willful, and calculated to cause damage to Plaintiffs and the Warfield Project. The Town's conduct was perpetrated with the intentional and improper purpose of causing damage and was without justifiable cause.

188.   As a proximate cause of this tortious interference, Plaintiffs have suffered severe economic loss, the risk of their $8.2 million purchase price and additional investments since 2014, lost economic opportunity, project delays, carrying costs, continued degradation of the historic buildings, lost revenue, lost grants, and damage to their reputation and goodwill, all to their detriment.

WHEREFORE, Plaintiffs Warfield Historic Properties, LLC, Warfield Historic Quad, LLC, Warfield Restorations, LLC, Warfield Center, LLC, and Warfield Properties, LLC respectfully request that the Court enter judgment against Defendant Town of Sykesville and award damages in an amount exceeding $75,000, including but not limited to $20,400,000, and for such other and further relief the Court deems appropriate.

Respectfully submitted,

By:     /s/ *Timothy F. Maloney*
Timothy F. Maloney (Bar No. 03381)
Alyse L. Prawde (Bar No. 14676)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
TEL:   (301) 220-2200
FAX:   (301) 220-1214
tmaloney@jgllaw.com
aprawde@jgllaw.com
*Counsel for Plaintiffs*